FORD MOTOR CREDIT COMPANY, APPELLANT, *v.* POTTS, APPELLEE.

[Cite as Ford Motor Credit Co. *v.* Potts (1989), 47 Ohio St. 3d 97.]

(No. 88-1519—Submitted October 11, 1989—Decided December 20, 1989.)

*Porter, Wright, Morris & Arthur,* James P. Botti and *Carole D. Weiss,* for appellant.

*Legal Aid Society of Columbus,* Ruth F. Ross and *Leslie Varnado, Jr.,* for appellee.

*Legal Aid Society of Cleveland* and *Paul Herdeg,* urging affirmance for *amicus curiae,* Cleveland Consumer Action, Inc.

WRIGHT, J. The initial issue that we must decide involves two questions. First, as a matter of law, does R.C. 1317.12, 1317.16 or 1309.47 require a secured creditor to take steps beyond sending notice of sale (and, if sent together, notice of right to cure), by certified mail to the debtor's last known address? Second, do these statutes stay the creditor's right to sell the collateral until after the creditor receives the certified mail receipt showing that the notice was delivered as addressed?

The second issue before us is whether, as a matter of law, Ford Motor's sale of the debtor's vehicle was commercially reasonable and was conducted in compliance with R.C. 1317.16(B) and 1309.47. We are asked to apply these two statutes to the following circumstances: where, after proper advertisement, the disposition was by public sale; where the disposition accorded with the usual manner of sale in a recognized market; and where the vehicle sold for more than two-thirds of its original cash price.

For the reasons that follow, the opinion of the court of appeals is reversed and the judgment of the trial court is reinstated.

I

R.C. 1309.47 governs the secured party's right to dispose of collateral after default. R.C. 1309.47(F) states that this statute is "subject to the limitations of section 1317.16 of the Revised Code." A provision of the Retail Installment Sales Act ("RISA"), R.C. 1317.16(B), requires that a secured party repossessing collateral pursuant to a retail installment sales contract must, at least ten days prior to sale, "* * * send notification of the time and place of such sale and of the minimum price for which such collateral will be sold, together with a statement that the debtor may be held liable for any deficiency resulting from such sale, by certified mail, return receipt requested, to the debtor at his last address known to the secured party, and to any persons known by the secured party to have an interest in the collateral. In addition, the secured

party shall cause to be published, at least ten days prior to the sale, a notice of such sale listing the items to be sold, in a newspaper of general circulation in the county where the sale is to be held."

Further, RISA establishes strict criteria for the contents of the notice to the debtor to allow the debtor to cure his default. The secured party "* * * shall, within five business days after taking possession, send to the debtor a notice setting forth specifically the circumstances constituting the default and the amount by itemization that the debtor is required to pay to cure his default. Any notice required by section 1309.47 or 1317.16 of the Revised Code may be included as part of the notice required by this section. A secured party who disposes of the collateral without sending notice required by this section may not recover the costs of retaking possession of the collateral and is not entitled to a deficiency judgment." R.C. 1317.12.

These two provisions afford consumers special protection by requiring creditors to follow precise procedural requirements when giving notice to consumers of impending sales of repossessed collateral. Yet the General Assembly has also recognized that consumer default occurs frequently. The legislature has balanced the need to protect consumers from creditor overreaching with the need to provide creditors with a simple and standardized repossession and resale mechanism should default occur. Given these policy guidelines, R.C. 1317.16(B) specifically instructs the secured party to send the notice of sale by certified mail. R.C. 1317.16 does not require that notice of sale be sent using any other or further method.

In the case at hand, Ford Motor has indisputably and precisely complied with the statutory requirements.

The statute is clear on its face. Contrary to the court of appeals' opinion, the statutes nowhere require the secured party to delay its sale until return of the certified mail receipt. The court of appeals erred in holding that Ford Motor was required to take further steps to notify the debtor. This holding incorrectly interprets the plain language of the statute. Such a holding, if allowed to stand, might serve to erode the entire notice process, which is a pivotal point upon which our entire system of due process and speedy resolution of disputes in this area is based.

It is well-established law in Ohio that "[a] secured creditor can * * * satisfy the notice requirements set forth in R.C. 1309.47 merely by sending notice to the debtor. Actual receipt of the notice is not required and need not be proven. All that is required of the creditor under R.C. 1309.47 is that he take reasonable steps to notify the debtor of his intentions to resell certain repossessed collateral. * * *" *BancOhio Natl. Bank* v. *Freeland* (1984), 13 Ohio App. 3d 245, 247, 13 OBR 298, 300, 468 N.E. 2d 941, 944, citing *Umbaugh Pole Bldg. Co.* v. *Scott* (1979), 58 Ohio St. 2d 282, 12 O.O. 3d 279, 390 N.E. 2d 320.

In fact, no statute or controlling case law specifies that the debtor must actually sign the notice, indicating actual receipt. In *Freeland, supra,* the creditor was unable to produce a signed or unsigned mail receipt. The court in *Freeland* nonetheless found that the creditor had fulfilled the reasonable notice of resale requirement of R.C. 1309.47 by sending a certified mail notice in a timely and proper manner addressed to defendant's correct address. *Id.* at 247, 13 OBR at 300, 468 N.E. 2d at 944.

The facts of *First Natl. Bank* v. *Turner* (1981), 1 Ohio App. 3d 152, 1

OBR 463, 439 N.E. 2d 1259, are very similar to the case at bar with regard to notice. In *Turner*, the court held that where the secured party had sent notice of sale of repossessed collateral by certified mail properly addressed to the debtor, where three notices of arrival of the letter were left at the debtor's address, and where notice was returned by the postal authorities as "unclaimed," the creditor had complied with the notice requirements of R.C. 1309.47. *Id.* at 154, 1 OBR at 464-465, 439 N.E. 2d at 1262. *Freeland* and *Turner* take on even more significance when we note that those decisions refer to R.C. 1309.47, which does not designate a specific means of notice. Since Ohio courts have approved of the certified mail scheme as satisfying due process, the result should not be different for a case such as the one at bar, where the Revised Code specifically mandates a certified mail scheme.

The court of appeals itself noted the salutary effects of Ohio's statutory certified mail scheme, because it gives "assurance that a secured party will attempt to send notification in the manner most likely to notify and in a manner most likely to reasonably assure accomplishment of the receipt of notification by the debtor."

The court of appeals erred in imbuing R.C. 1317.12 and 1317.16 with a "good faith" requirement on the part of the creditor. In doing so, the court of appeals relied on *Huntington Natl. Bank* v. *Stockwell* (1983), 10 Ohio App. 3d 30, 10 OBR 38, 460 N.E. 2d 303, and *BancOhio Natl. Bank* v. *Cousins* (May 31, 1984), Franklin App. No. 83AP-937, unreported. Unfortunately, both of these cases are inapplicable to the particular facts at bar.

The court of appeals cited *Stockwell* for the proposition that a secured party must "* * * comply with R.C. 1317.12 and R.C. 1317.16 in such a manner that the secured party reasonably assures that each debtor will receive actual notice unless prevented by some fault of the debtor." In *Stockwell, supra,* the mandated notice of the repossession sale did not reach one of the debtors. Marital difficulties had caused the husband to move to another residence and to place a forwarding order on his mail. The creditor sent only one notice, which was addressed to both debtors at the same address. Since the post office forwarded the notice to the husband at his new address, Mrs. Stockwell never received notice.

*Stockwell* is distinguishable from the case at bar for several reasons. First, Potts's notice was twice delivered to the correct address; Mrs. Stockwell's notice was never so delivered. Second, Mrs. Stockwell was entitled under R.C. 1317.16 to receive a separate notice, since all persons who are indebted to the creditor by virtue of the retail installment sale or who have an interest in the collateral must be sent a notice. That notice did in fact go to the debtor Potts, but never went to the debtor Mrs. Stockwell. Third, it can credibly be asserted that Potts, who had herself voluntarily turned the car over to Ford Motor to sell, had constructive notice of the sale. Notice to claim certified mail was twice sent to her residence and she ignored same. No such claim can be made about Mrs. Stockwell, whose estranged husband had voluntarily turned the vehicle over to the creditor.

The court of appeals cited *Cousins, supra,* for the proposition that "* * * R.C. 1317.12 and R.C. 1317.16 contemplate a good faith effort on the part of the secured party to give notice to the debtor of repossession and impending sale. * * *" In explaining the "good faith" requirements of R.C.

1317.12 and 1317.16, the court in *Cousins* referred to the statutory mandates that notice must be sent to the debtor at the last address known to the secured party, and averred that "* * * [t]hese statutes imply at least a diligent effort on the secured party's part to ascertain the address of the debtor to whom they are sending notice. * * *"

We reject the reasoning advanced in *Cousins*. In that case, the notice of sale was sent by certified mail to one of two addresses supplied by the debtor on the loan application. The notice was returned, marked "moved, left no address." The *Cousins* court held that once the certified mail letter was returned, the secured party had a duty to make further attempts to notify the debtor, particularly given that the secured party had knowledge of a second address. In essence, the *Cousins* court required the secured party to send notice to the last known "correct" address of the debtor.

We hold, therefore, that Ford Motor complied as a matter of law with notice requirements set forth in R.C. 1317.12 and 1317.16.

## II

Ford Motor has also asserted error in the court of appeals' holding that a genuine issue of fact existed as to whether the offering and the final terms of the sale were commercially reasonable. Both R.C. 1317.16(B) and 1309.47 mandate that the sale of repossessed collateral by a secured party under a RISA contract be commercially reasonable in method, manner, time, place, and terms. The Revised Code does not clearly define the term "commercially reasonable," but R.C. 1309.50(B) does list factors to contemplate in determining whether a sale is commercially reasonable:

"The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold, he has sold in a commercially reasonable manner. * * *"

R.C. 1309.50 (UCC 9-507) applies to any sale under R.C. 1309.47 (UCC 9-504), which governs the right to dispose of repossessed collateral. The court of appeals correctly asserted that R.C. 1309.50 can apply equally well to determine the commercial reasonableness of a transaction as the term is used in R.C. 1317.16, governing the manner of disposition.

Unfortunately, the court of appeals concluded that the facts establish the possibility of a commercially unreasonable sale where the terms of the sale required a minimum bid that was too low; where the difference between the minimum stated bid and the original sale price was too drastic; and where Ford Motor failed to demonstrate that it had sold the collateral in the usual manner in a recognized market. The court also averred that "[i]n light of the evidence of a commercially unreasonable minimum required bid and the lack of any evidence other than the plaintiff's [*i.e.*, the secured party's] self-serving assertions, that the final sale terms were commercially reasonable, it was error for the trial court to find that as a matter of law the * * * [plaintiff] had no duty to set a minimum bid of more than $1,500 for the vehicle at public auction. * * *"

The court of appeals first erred by

stating that Ford Motor had placed no evidence in the record to establish that it resold the vehicle in the usual manner in a recognized market. Ford Motor had submitted into evidence the terms of the sale and the time, place, method, and manner of the sale. By affidavit, Ford Motor established that the sale had been advertised in conformance with R.C. 1317.16. The affidavit asserted that Ford Motor had placed a newspaper advertisement in The Columbus Dispatch at least ten days prior to the sale in the county in which the sale was to be held, as required by R.C. 1317.16. The advertisement named the date of sale, the time of sale, the conductor of the sale, and the location of the sale. The affidavit demonstrated that the sale was conducted as advertised and that the proceeds of the sale, $6,275, were applied to reduce the deficiency that Potts owed to Ford Motor.

It cannot be doubted then that this resale was conducted "in the usual manner in any recognized market therefor" as contemplated by R.C. 1309.50(B) and by public sale, as required by R.C. 1317.16(B). Equally, it cannot be doubted that the sale price of $6,275 was an adequate price to receive for a no-longer-new car that had to be sold at public sale by statute. See R.C. 1309.50(B).[1] See, also, White & Summers, Uniform Commercial Code (3 Ed. 1988) 616, Section 27-15. Ford Motor presented evidence from the National Auto Dealers Association Official Used Car Guide, a recognized source for pricing used automobiles, that established that the $6,275 net proceeds it received from the resale were actually higher than the average wholesale value of the vehicle. As the wholesale market is considered to be the market in which a repossessed car is sold (see White & Summers, Uniform Commercial Code [3 Ed. 1988] 598, Section 27-11), we find the $6,275 net proceeds to be more than commercially reasonable given the facts of this case.

We must also find error in the court of appeals' holding that the trial court could not, as a matter of law, find a minimum required bid of $1,500 to be commercially reasonable for a fourteen-month-old vehicle which had eleven thousand miles on the odometer and which had an original "cash price" of $9,224. While R.C. 1317.16(B) requires that a minimum bid price be established and sent to the debtor, the statute makes no reference to how to calculate a proper minimum bid price. Second, this minimum bid is not advertised and thus can have little or no effect on dampening bidding enthusiasm at auction.

Third, one can contrast the repos-

---

[1] R.C. 1309.50(B) provides:

"The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold, he has sold in a commercially reasonable manner. The principles stated in the two preceding sentences with respect to sales also apply as may be appropriate to other types of disposition. A disposition which has been approved in any judicial proceeding or by any bona fide creditors' committee or representative of creditors shall conclusively be deemed to be commercially reasonable, but this sentence does not indicate that any such approval must be obtained in any case nor does it indicate that any disposition not so approved is not commercially reasonable."

session-resale minimum bid procedure for secured transactions under R.C. 1317.16 with the bid procedure for real estate foreclosures under R.C. 2329.20. The General Assembly recognized the importance of protecting debtors from unscrupulous practices in foreclosing on the family homestead. Establishing a floor or minimum price for real estate foreclosures insures that the savings of the average family will not be inequitably dissipated. Thus, R.C. 2329.20 provides that real estate shall not be sold at a foreclosure sale for less than two thirds of its appraised value. Clearly, the legislature has placed a much greater emphasis on a price floor for real estate than for collateral repossessed from a consumer by a secured creditor. The absence of a statutory minimum percentage bid for repossessed collateral lends credibility to the idea that the legislature was more concerned with creditors in such cases following statutory guidelines for repossession and sale than with establishing a floor for minimum bids, below which a bid would be considered commercially unreasonable. Finally, we note that bidders at automobile auctions must, of necessity, take a certain risk because they have no significant opportunity to inspect the sale item and have no access to a detailed history of its prior use. To help stimulate bidding, a minimum bid is established. While this price is not made public, its presence does help to insure that unrealistically low bids will not succeed. A low bid minimum also insures that auction buyers will be encouraged to take a risk by the opportunity to obtain a worthy purchase otherwise unavailable. For these reasons, we find the $1,500 minimum stated bid to have been commercially reasonable.

As we have found, as a matter of law, that Ford Motor's notice to Potts accorded with statutory requirements and that the manner of carrying out its resale of repossessed collateral was commercially reasonable, we need not discuss in great detail the court of appeals' reversal of the trial court's grant of Ford Motor's motion for summary judgment. Civ. R. 56(C) provides that:

"* * * Summary judgment shall be rendered forthwith if the pleading, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. * * * A summary judgment shall not be rendered unless it appears from such evidence or stipulation and only therefrom, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence or stipulation construed most strongly in his favor. * * *"

The trial court had ample evidence before it to grant Ford Motor's motion for summary judgment.

Accordingly, the decision of the Court of Appeals for Franklin County is reversed and the decision of the Court of Common Pleas of Franklin County is reinstated.

*Judgment reversed.*

MOYER, C.J., HOLMES, DOUGLAS and H. BROWN, JJ., concur.

SWEENEY, J., concurs in judgment only.

RESNICK, J., dissents.

ALICE ROBIE RESNICK, J., dissenting. I must respectfully dissent due to the explicit language of R.C. 1317.16(B). That statute provides in part: "* * * At least ten days prior to sale the secured party shall send notification of the time and place of such sale and of the minimum price for which such collateral will be sold, together with a statement that the debtor may be held liable for any deficiency resulting from such sale, by certified mail, *return receipt requested,* to the debtor at his last address known to the secured party, and to any persons known by the secured party to have an interest in the collateral. * * *" (Emphasis added.)

As correctly pointed out by the majority opinion, R.C. 1317.16(B) does not require "that notice of sale be sent using any other or further method." The operative words focused upon by my fellow justices appear to be "shall send" and "by certified mail." However, the majority seems to have overlooked the language emphasized above: "return receipt requested." The importance of this additional phraseology employed by the General Assembly is exemplified in the factual setting of the case before us.

On November 23, 1984, Dasie Potts' automobile was repossessed as the result of a replevin action. On November 29, Ford Motor sent Potts a notice of public sale, which, as noted by the majority, contained the requisite information pursuant to the Ohio Revised Code. On December 19, the automobile was sold at a public auction. On or about December 24, five days *after* the sale of the car, the post office returned the notice to Ford Motor as unclaimed.[2] Therefore, it is quite clear from the record that Ford Motor sold the repossessed vehicle without any knowledge as to whether the public-sale notice was delivered to Dasie Potts at her last known address.

The holding pronounced by the majority that the statute does not "require the secured party to delay its sale until return of the certified mail receipt" evades the precise wording of the statute. If the General Assembly had intended that all a creditor need do is send notice by certified mail, the additional language "return receipt requested" would have been unnecessary.[3] A close reading of R.C. 1317.16 (B) leads to the conclusion that a secured party should not schedule a sale until it receives the return receipt from the postal authorities. This conclusion is consistent with prior Ohio case law holding that actual notice to the debtor is not required. See *Banc-Ohio Natl. Bank* v. *Freeland* (1984), 13 Ohio App. 3d 245, 247, 13 OBR 298, 300, 468 N.E. 2d 941, 944. The statute clearly does not require that a debtor

---

[2] There is no evidence in the record as to why the notice was unclaimed. However, the record does disclose that at this time, Dasie Potts was seventy-eight years old and in poor health.

[3] The majority claims that "it can credibly be asserted that [Dasie] Potts, who had herself voluntarily turned the car over to Ford Motor to sell, had constructive notice of the sale." The statute makes no mention of "constructive notice." By establishing a certified mail scheme, the General Assembly has sought to provide Ohio consumers with a safeguard mechanism so that they may be better able to protect their interests in personal property. In doing so, the General Assembly clearly sought to avoid the anomalous and harsh results that accompanies a "constructive" theory of notice. By alluding to the notion that constructive notice may be sufficient, this court undermines the protections afforded Ohio consumers by the General Assembly.

actually receive notice of sale, but the wording of the statute intimates more is required of a creditor than merely sending notice and conducting a sale. Therefore, I find that by conducting a sale prior to receiving the return receipt, Ford Motor has not complied with the notice requirements of R.C. 1317.16. For these reasons I respectfully dissent.