OPINION
Plaintiffs-appellants, Elizabeth and Bryan Howard, appeal from a judgment of the Franklin County Court of Common Pleas granting the summary judgment motion of defendant-appellee, SunStar Acceptance Corporation ("SunStar").
This appeal arises out of appellants' failure to timely make payments on their car loan. The evidence submitted in support and opposition to SunStar's motion for summary judgment consists principally of appellants' depositions, SunStar's "Shaw System" printouts[1] ("Shaw notes"), and the affidavit of SunStar's former vice president and manager of collections, Troy Miller. The evidence reveals the following: On March 19, 1996, appellants purchased a used 1994 Oldsmobile from Jack Schmidt Oldsmobile pursuant to a written retail installment contract. Appellants financed $10,183.48 of the car's $11,683.48 purchase price through Jack Schmidt Oldsmobile for sixty months at an annual percentage rate of twenty-five percent, bringing the total cost of the car to $19,433.40. Shortly after the sale, Jack Schmidt Oldsmobile assigned the retail installment contract to SunStar.
Beginning with the payment that was due on October 19, 1997, appellants ceased making their car payments. By April 15, 1998, appellants were six months behind on their car loan payments and had accumulated an arrearage of more than $1,800. By letter dated April 15, 1998, SunStar notified appellants of the amount of their arrearage, and as a result of the arrearage, SunStar was preparing to pursue the collection options available to it under the retail installment contract, and appellants could avoid such collection by immediately paying the amount owed by "Western Union Quick Collect" or by contacting SunStar's collection department at a number provided. SunStar received neither payment nor a telephone call from appellants in response to this letter. However, Elizabeth Howard testified that she and her husband did not receive the letter until May 15, 1998.
On May 7, 1998, SunStar repossessed appellants' car. On that same date, Elizabeth telephoned SunStar's collection department to inquire about how to get their car back. According to Elizabeth's deposition testimony, the SunStar employee to whom she spoke informed her that in order to get their car back, appellants would have to pay the current arrearage, which now totaled $2,101.01, plus a repossession fee of $325. In response to appellants' first request for production of documents, SunStar provided photocopies of its Shaw notes for appellants' account. A May 7, 1998 entry in the Shaw notes confirms both the existence and contents of Elizabeth's telephone call to SunStar on that date.
On May 12, 1998, SunStar sent separate notices entitled "Right to Cure Default and Notice of Sale if Default Not Cured" to appellants at their home address by certified mail, return receipt requested. Nonetheless, appellants both testified during their depositions that they never received these May 12, 1998 notices. Further, the itemized list of amounts owed, which the notices contained, included not only the $2,101.01 arrearage and $325 repossession fee, which SunStar's employee had indicated were owed by appellants when Elizabeth telephoned the company's collections department on May 7, 1998, but also an unexplained additional charge of $597.78, an amount equivalent to two of appellants' monthly car payments.
By May 22, 1998, Bryan Howard obtained a $3,400 loan from his employer. Therefore, on that same day, Elizabeth called SunStar to confirm the amount of the payment required to redeem their car, and where and how to send the money. Despite the fact that by the time of this phone call appellants' arrearage on their car loan had increased by an additional $298.89, which was the amount due on May 19, 1998, Elizabeth testified that the SunStar representative to whom she spoke told her that a payment of $2,101.01, plus a repossession fee would allow them to get their car back. Elizabeth further testified that SunStar's representative told her that the amount of the repossession fee was $300, rather than $325, as she had previously been told. Although SunStar's Shaw notes confirm that Elizabeth called on May 22, 1998, to inquire how much they needed to pay to get their car back, the notes do not indicate what she was told.
On May 26, 1998, Elizabeth sent a payment to SunStar via Western Union Quick Collect. According to Elizabeth's testimony, the amount of the payment was $2,401.01. SunStar's Shaw notes, however, reflect a credit to appellants' account on May 28, 1998 of $2,390.01.
On June 1, 1998, Elizabeth telephoned SunStar to inquire about getting their car back. The SunStar representative to whom Elizabeth spoke told her that her payment had not posted and that she should call back in a day or two. On June 3, Elizabeth again called SunStar to inquire about getting her car back. According to Elizabeth's deposition testimony, during this telephone call, a SunStar supervisor told her that although SunStar had received and credited her payment, her account had been closed and that there was no longer any way for her to get her car back. Although SunStar's Shaw notes confirm that Elizabeth called on June 3, 1998 about getting their car back, these notes do not indicate she was told that her account had been closed. Rather, SunStar's Shaw notes indicate SunStar had credited a payment of $2,390.01 to appellants' loan account and that there was some confusion regarding whether the payment was sufficient to allow for the return of appellants' car. In any event, the Shaw notes indicate that by June 4, 1998, SunStar had concluded appellants' payment was insufficient even to bring them current on their car loan and, consequently, the payment had simply been credited against appellants' loan balance. Further, an entry made in the Shaw notes at 9:50 a.m. on June 4, 1998, indicated SunStar determined it would sell appellants' car unless they paid the entire loan balance by the end of the day. A subsequent entry from the same day indicated a SunStar representative spoke to one of the appellants at 3:15 p.m., and was advised by appellants they would not be able to pay the entire balance.
The Shaw notes further indicated Bryan called SunStar on June 5, 1998, asking to speak with a supervisor. According to the Shaw notes, the SunStar representative with whom Bryan spoke explained appellants' account had already been reviewed by a manager and told Bryan where their car was being held for sale.
On June 18, 1998, appellants' car was sold for $2,755. SunStar applied the proceeds of the sale to appellants' loan balance.
On September 8, 1998, appellants filed a complaint in the Franklin County Court of Common Pleas naming SunStar as defendant, asserting claims for: (1) breach of R.C. 1309.47(C) notice requirement; (2) breach of an oral contract to return the car in exchange for appellants' May 26, 1998 payment; (3) breach of R.C. 1309.49 right of redemption; (4) breach of contract arising out of SunStar's failure to comply with R.C.1301.09 obligation of good faith; (5) breach of R.C. 1317.12 notice requirement; (6) breach of R.C. 1317.16 notice requirement; (7) conversion; (8) intentional infliction of emotional distress; and (9) malice sufficient to demonstrate entitlement to punitive damages under R.C. 2315.21(B)(1).
On November 9, 1998, SunStar filed its answer together with a counterclaim seeking to recover the deficiency on appellants' car loan account.
On October 15, 1999, SunStar filed a motion for summary judgment seeking judgment on appellants' nine claims and its own counterclaim. Appellants did not file a memorandum contra SunStar's summary judgment motion, but filed a series of motions that sought to explain their inability to adequately respond to SunStar's motion for summary judgment. These motions included motions to file an amended complaint and to compel production of documents filed on October 20, 1999, a Civ.R. 56(F) motion and affidavit filed on November 5, 1999, and a motion to amend the case scheduling order filed on November 11, 1999.
At 10:17 a.m. on December 15, 1999, appellants filed a notice of voluntary dismissal of their complaint pursuant to Civ.R. 41(A)(1)(a).
At 4:32 p.m. on December 15, 1999, the trial court issued a decision and entry denying appellants' Civ.R. 56(F) motion and granting SunStar's motion for summary judgment in all respects. Appellants appeal, assigning the following errors:
 I. THE TRIAL COURT COMMITTED ERROR IN GRANTING DEFENDANTS' [sic] MOTION FOR SUMMARY JUDGMENT ON DEFENDANTS' [sic] COUNTERCLAIM.
 II. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN OVERRULING PLAINTIFFS' CIVIL RULE 56(F) AFFIDAVIT, GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS, PLAINTIFFS' MOTION TO AMEND CASE SCHEDULING ORDER, AND PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED OR SUPPLEMENTAL COMPLAINT WITHOUT PROVIDING PLAINTIFFS THE OPPORTUNITY FOR SUFFICIENT DISCOVERY, AND WITHOUT PROVIDING PLAINTIFFS A REASONABLE EXTENSION OF TIME IN WHICH TO OPPOSE THE MOTION FOR SUMMARY JUDGMENT WITH SUCH EVIDENCE AS WAS THEN AVAILABLE.
Appellants' first assignment of error primarily challenges the trial court's grant of summary judgment for SunStar on SunStar's counterclaim. However, appellants also argue under their first assignment of error that the trial court's grant of summary judgment for SunStar on their nine claims was erroneous, as appellants' voluntary dismissal of their complaint a few hours before the journalization of the trial court's decision and entry deprived the trial court of jurisdiction to rule on the claims. It is this second issue that we will address first.
The question of whether appellants' voluntary dismissal deprived the trial court of jurisdiction is governed by Civ.R. 41(A)(1), which provides:
 [A]n action may be dismissed by the plaintiff without order of court (a) by filing a notice of dismissal at any time before the commencement of trial unless a counterclaim which cannot remain pending for independent adjudication by the court has been served by the defendant * * *.
Civ.R. 41(A)(1)(a) gives a plaintiff an absolute right to voluntarily and unilaterally dismiss his cause of action at any time prior to trial, Conley v. Jenkins (1991), 77 Ohio App.3d 511, 516, unless the defendant has filed a counterclaim which cannot be adjudicated in the absence of the plaintiff's claims. Goble v. Univ. Hosp. of Cleveland (1997),119 Ohio App.3d 555, 557. The right to voluntarily dismiss an action under Civ.R. 41(A)(1) exists regardless of the plaintiff's motive. Kracht v. Kracht (June 5, 1997), Cuyahoga App. No. 70005, unreported. In fact, the right to voluntarily dismiss one's claims has been upheld even where the notice of dismissal was filed after the trial court has announced its intent to rule in favor of the opposing party, but before the judgment entry journalizing such ruling was filed. Conley, at 511-515; Standard Oil Co. v. Grice (1975), 46 Ohio App.2d 97 . "A court speaks only through its journal entry, and until journalized, a court's decision can have no effect on a party's right to voluntarily dismiss an action pursuant to Civ.R. 41(A)." Bank One v. O'Brien (Dec. 31, 1991), Franklin App. No. 91AP-165, unreported. The filing of a voluntary dismissal immediately divests the trial court of jurisdiction over the complaint. Goble, supra.
In the present case, it is undisputed that appellants filed their notice of voluntary dismissal before the trial court filed its entry journalizing its decision granting summary judgment for SunStar. Further, moving for summary judgment on a claim does not constitute "the commencement of trial" on claims for purposes of Civ.R. 41(A)(1). Standard Oil, at 99-101.
SunStar contends, however, appellants' notice of voluntary dismissal was ineffective because its counterclaim for a deficiency judgment "cannot remain pending for independent adjudication." In support of this position, SunStar points to the fact that its counterclaim and appellants' claims require an inquiry into many of the same facts. Accordingly, SunStar asserts that allowing appellants to dismiss their claims and then refile them later would subject it to the great inconvenience of having to litigate closely related matters in separate proceedings, and would waste judicial resources.
SunStar is correct in its assertions that appellants' voluntary dismissal is likely to inconvenience it and is not the most efficient use of judicial resources. However, it is well-established that Civ.R. 41(A)(1) permits such voluntary dismissals despite the fact that they may result in inconvenience or be subject to abuse. Kracht, supra. Further, the case law interpreting Civ.R. 41(A)(1)(a) indicates that a counterclaim will only be found to be one "which cannot remain pending for independent adjudication," and where the plaintiff's claims actually provide the basis for the counterclaim. Compare Cook v. Williams (June 20, 1986), Lucas App. No. L-85-093, unreported (holding plaintiff's complaint for legal malpractice could not be voluntarily dismissed after the defendant had filed a counterclaim alleging damage to his reputation resulting from the filing of plaintiff's malpractice claim, as the counterclaim could not be adjudicated in the absence of the plaintiff's malpractice claim); with Gravill v. Akram (Aug. 31, 1989), Cuyahoga App. No. 57392, unreported (holding plaintiff's claim to recover on a promissory note could be voluntarily dismissed, as the defendant's counterclaim alleging that the plaintiff committed a slander of title to the defendant's property when he caused the defendant to enter into the promissory note with plaintiff under duress, could have been brought as a separate action); and Holly v. Osleisek (1988), 40 Ohio App.3d 90, 91
(holding plaintiff's complaint for damages arising out of an automobile accident with the defendant could be voluntarily dismissed, as there was "no impediment to an independent adjudication of the defendant's counterclaim" for his own damages arising out of the auto accident).
Here, although appellants' complaint and SunStar's counterclaim unquestionably arose out of the same circumstances and will require the presentation of many of the same facts, appellants' claims did not give rise to SunStar's counterclaim. Rather, SunStar's counterclaim for a deficiency judgment is independent of appellants' claims and could have been brought as a separate action. Because SunStar's counterclaim is capable of being adjudicated independently of appellants' claims, appellants' voluntary dismissal of their claims was effective. There may be compulsory counterclaim and collateral estoppel issues if appellants commence a new action reasserting these claims, but that matter is not before us at this time. Therefore, the trial court was without jurisdiction to render judgment on appellants' claims, and the trial court's grant of summary judgment for SunStar on appellants' claims must be vacated.
We now turn to the issue of whether the trial court erred in granting SunStar summary judgment on its counterclaim. Appellants contend that SunStar was not entitled to a deficiency judgment because it failed to comply with R.C. 1309.47 and 1317.16.
R.C. 1309.47 sets forth the general rules governing the rights and duties of secured parties and debtors where a secured party seeks to dispose of repossessed collateral. Ford Motor Credit Company v. Potts (1989), 47 Ohio St.3d 97, 98. However, pursuant to R.C. 1309.47(F), the rules set forth in R.C. 1309.47 are "subject to the limitations of section 1317.16 of the Revised Code." R.C. 1309.47(F). R.C. 1317.16, which is part of the Retail Installment Sales Act ("RISA"), sets forth more specific rules which govern the rights of secured parties to dispose of collateral following repossession in cases where the security interest arises out of a retail installment sales contract. Id. The duties imposed by R.C. 1317.16 on secured parties operating pursuant to retail installment contracts are greater than those imposed by R.C. 1309.47 on secured parties generally. Specifically, where a secured party's security interest arises out of a retail installment contract, R.C. 1317.16(B) permits repossessed collateral to be sold only by public sale. R.C.1317.16(B) also requires that before selling repossessed collateral, a secured party must "[a]t least ten days prior to sale * * * send notification of the time and place of such sale and of the minimum price for which such collateral will be sold, together with a statement that the debtor may be held liable for any deficiency resulting from such sale, by certified mail, return receipt requested, to the debtor at his last address known to the secured party * * *. In addition, the secured party shall cause to be published, at least ten days prior to the sale, a notice of such sale listing the items to be sold, in a newspaper of general circulation in the county where the sale is to be held." In contrast, R.C. 1309.47(C) permits repossessed collateral to be sold by either public or private sale, and only requires the secured party to provide the debtor with "reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made * * *."
As a preliminary matter, SunStar argues that RISA, and therefore R.C.1317.16 do not apply to its sale of appellants' car because SunStar is a financial institution rather than the retail seller of the car. SunStar is correct that in many cases transactions involving financial institutions are exempt from RISA. This exemption arises out of the fact that RISA applies only to retail installment contracts that arise out of "consumer transactions." Huntington National Bank v. Cole (1987),44 Ohio App.3d 28, 29. R.C. 1317.01(P) defines "consumer transaction" for RISA purposes, in pertinent part, as "a sale, lease, assignment, or other transfer of an item of goods, or a service, except those transactions between persons, defined in sections 4905.03 and 5725.01 of the Revised Code, and their customers * * * to an individual for purposes that are primarily personal, family, or household." "Financial institutions" are one of the groups of persons defined in R.C. 5725.01, and it is undisputed that SunStar falls within this definition. Accordingly, SunStar contends that the transaction between it and appellants did not constitute a "consumer transaction" for purposes of R.C. 1317.01(P), and that RISA is therefore inapplicable to the transaction.
In determining whether RISA applies to transactions involving financial institutions, the courts have distinguished between two-party and three-party transactions, with only the latter being covered by RISA. Butz v. Society National Bank of the Miami Valley (1987), 83 B.R. 459,462; Huntington National Bank v. Elkins (1987), 43 Ohio App.3d 64, 67; Euclid National Bank v. Hodge (1985), Cuyahoga App. No. 49705, unreported. Contra Bank One of Columbus v. Childers (Dec. 23, 1981), Franklin App. No. 81AP-395, unreported. A two-party transaction occurs where the financial institution makes a direct loan to a buyer, who then grants the financial institution a security interest in the goods purchased with the loan proceeds. Butz, supra. A third-party transaction occurs where a retailer extends credit to a buyer and takes a security interest in the goods being purchased on credit, and subsequently assigns the note and security interest to a financial institution. Id. The rationale for applying RISA to three-party transactions, but not to two-party transactions, is that in a three-party transaction the financial institution has obtained its security interest through a retail seller's assignment of a retail installment contract, whereas in a two-party transaction the financial institution is never a party to the retail installment contract. Butz, Elkins, supra.
The transaction at issue in the present case was a three-party, rather than a two-party transaction. The retail installment contract, which gave rise to SunStar's security interest in appellants' car, reveals that it was entered into between appellants and the seller of the car, Jack Schmidt Oldsmobile. According to the contract, Jack Schmidt Oldsmobile extended credit to appellants and took a security interest in the car. It was only after this initial transaction that SunStar acquired the contract and the accompanying security interest in appellants' car through an assignment from Jack Schmidt Oldsmobile. Accordingly, RISA and specifically the notice requirements set forth in R.C. 1317.16(B), apply to SunStar's sale of appellants' repossessed car.
In challenging the trial court's grant of summary judgment in favor of SunStar on its counterclaim for a deficiency judgment, appellants assert the evidence before the trial court failed to establish that SunStar complied with either the notice or publication requirements set forth in R.C. 1317.16(B). SunStar counters that the separate notices of "Right to Cure Default and Notice of Sale if Default Not Cured," which it sent to appellants on May 12, 1998, satisfied the requirements of R.C. 1317.16(B).
Appellants first argue that the May 12, 1998 notices sent by SunStar did not satisfy the requirements of R.C. 1317.16(B), because they never received the notices. In order to satisfy the notice requirements of R.C. 1309.47(C) and 1317.16(B), a secured creditor party need only show that it sent the required notice to the debtor. Ford Motor Credit, supra, at 99. Actual receipt of the notice by the debtor is not required and need not be proven. Id. Here, Troy Miller's affidavit indicates that SunStar sent the May 12, 1998 notices to appellants' correct address by certified mail, return receipt requested, as required by R.C. 1317.16(B).
Appellants next contend that SunStar's May 12, 1998 notices failed to comply with R.C. 1317.16(B), in that the notices failed to contain much of the information required by that provision. A careful review of the May 12, 1998 notices reveals appellants are correct in several respects.
First, in the location provided on the notices for indicating the minimum price for which the collateral will be sold, the notices contain a nearly illegible handwritten notation which we surmise to be a shorthand for "undetermined." R.C. 1317.16(B) plainly requires notice to the debtor of the "minimum price for which the collateral will be sold." Indicating that the minimum price is undetermined, let alone doing so in a manner that requires the reader to guess the entry's meaning, plainly fails to satisfy this requirement.
The May 12, 1998 notices also fail to provide notice of the "place" where appellants' car was to be sold. In the space on the notice forms for indicating the location of the sale, the May 12, 1998 notices contain the following illegible handwritten notation:
A June 1, 1998 entry in SunStar's Shaw notes suggest that notation is a shorthand for "Adesa Cincinnati." Of course, had appellants received the notices, they would not have had access to the Shaw notes to aid them in interpreting the notices. However, even if the words "Adesa Cincinnati" had been clearly typed on the notices, the notices would have failed to provide adequate notice of the "place" in which appellants' car was to be sold. In order to satisfy R.C. 1317.16(B) "place" of sale requirement, the information provided must be reasonably calculated to allow the debtor to locate the place of sale. Liberty Bank v. Greiner (1978),62 Ohio App.2d 125, 129. Merely providing the name of the city in which the sale is to be held along with what we presume to be the name of the auction house which would conduct the sale, does not satisfy this requirement. Id.
Additionally, the May 12, 1998 notices do not contain the correct time of sale. The time of sale which appears on the notices is 10:00 a.m. on June 2, 1998, while Troy Miller's affidavit and SunStar's Shaw notes indicate appellants' car was actually sold on June 18, 1998. Accordingly, the notices also fail to comply with R.C. 1317.16(B) requirement that the debtor be provided with the "time" of the sale of his repossessed property.
Finally, appellants argue that there is no evidence that SunStar complied with R.C. 1317.16(B) publication requirement. In this respect, R.C. 1317.16(B) provides that before selling any repossessed collateral, a secured party must "cause to be published, at least ten days prior to the sale, a notice of such sale listing the items to be sold, in a newspaper of general circulation in the county where the sale is to be held." The record in the instant case contains no evidence of any publication regarding SunStar's planned sale of appellants' car.
While the record makes it abundantly clear that SunStar did not comply with the notice or publication requirements of R.C. 1317.16(B), the question of the consequences of this non-compliance remains. Appellants contend SunStar's failure to comply with the notice and publication requirements of R.C. 1317.16(B) act as an absolute bar to SunStar's collection of a deficiency judgment.
Prior to the adoption of Sub.S.B. No. 36 in 1992, R.C. 1309.47 was silent regarding the effect of a secured party's failure to comply with the notice requirements of R.C. 1309.47(C) or 1317.16(B).[2] This silence left the courts to craft a remedy for non-compliance and most held that a secured party's failure to comply with the notice requirements of R.C. 1309.47(C) or 1317.16(B), in connection with the sale of collateral constituted an absolute bar to the secured party's recovery of a deficiency judgment from the debtor. Huntington National Bank v. Stockwell (1983), 10 Ohio App.3d 30, 32; Liberty Bank, supra, at 131-132. In 1992, Sub.S.B. No. 36 amended R.C. 1309.47(B) to provide:
 (2)(a) If the security interest secures an indebtedness, the secured party must account to the debtor for any surplus, and, unless otherwise agreed, the debtor is liable for any deficiency.
 (b) If the secured party in disposing of collateral pursuant to this section has complied with the requirements of division (C) of this section, the amount of the deficiency, if any, to which the secured party is entitled shall be based on the actual proceeds of the disposition.
 (c) If the secured party in disposing of collateral pursuant to this section has failed to comply with the requirements of division (C) of this section, the amount of the deficiency, if any, to which the secured party is entitled shall be based on the appropriate value of the collateral as provided in division (B)(2)(d) or (e) of this section.
 (d) The appropriate value of the collateral under division (B)(2)(c) of this section shall be presumed to equal the secured indebtedness. The secured party may rebut this presumption by introducing some credible evidence of a lower appropriate value of the collateral. Evidence of the amount of the actual proceeds of the disposition is not, of itself, sufficient to rebut the presumption.
 (e) If the secured party rebuts the presumption described in division (B)(2)(d) of this section, the appropriate value of the collateral shall be deemed to equal the actual proceeds of the disposition, unless the debtor establishes that a greater amount would have been realized had the secured party complied with the requirements of division (C) of this section, in which case, the greater amount established by the debtor shall be deemed the appropriate value of the collateral. The debtor bears the burden of establishing the amount that would have been realized had the secured party complied with the requirements of division (C) of this section.
The 1992 amendments to R.C. 1309.47 adopted an alternative approach to dealing with a secured party's failure to comply with the statutory notice requirements prior to selling repossessed collateral. Under R.C.1309.47, as amended in 1992, where a secured party fails to comply with the statutory notice requirements prior to disposing of repossessed collateral, "the amount of the deficiency, if any, to which the secured party is entitled shall be based on the appropriate value of the collateral." R.C. 1309.47(B)(2)(c). In such case, the appropriate value of the collateral is presumed to be equal to the amount of the debtor's secured indebtedness, unless the secured party rebuts this presumption with evidence of a lower appropriate value for the collateral. R.C.1309.47(B)(2)(d). Thus, unless the secured party presents some evidence of a lower value for the collateral, the sale of the collateral is presumed to have been sufficient to cover the debtor's entire outstanding balance, effectively foreclosing the award of a deficiency judgment.
Given the evidence that SunStar failed to comply with the notice and publication requirements of R.C. 1317.16(B), prior to selling appellants' car, we can only conclude that genuine issues of material fact exist regarding whether SunStar is entitled to a deficiency judgment, and if so, the amount of that judgment. With respect to the amount of any deficiency judgment to which SunStar may be entitled, our review of the record in this case has revealed a discrepancy that bears pointing out. Specifically, SunStar's counterclaim alleges that after deducting appellants' lump sum payment on May 26, 1998, and the proceeds from the sale of the car, the remaining balance on appellants' car loan was $8,272.09. In contrast, SunStar's own Shaw notes, after taking the same deductions and adding several miscellaneous expenses incurred by SunStar, reflected an outstanding balance of only $5,172. Appellants' first assignment of error is sustained.
Appellants' second assignment of error challenges the trial court's grant of summary judgment for SunStar on appellants' nine claims. Our conclusion that appellants' voluntary dismissal of its claims divested the trial court of jurisdiction over their claims renders this assignment of error moot. Accordingly, we decline to address it. App.R. 12(A)(1)(c).
Having sustained appellants' first assignment of error and having found their second assignment of error moot, we reverse the judgment of the trial court and remand this matter for further proceedings consistent with this opinion.
 _________________________ McCORMAC, J.
BOWMAN and BROWN, JJ., concur.
McCORMAC, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.
[1] SunStar's "Shaw System" is a computerized system of account activity logs. The activity logs are organized by account, date, and time and contain brief notes pertaining to account activity, including telephone contacts between accountholders and SunStar's representatives.
[2] Pursuant to R.C. 1317.16(C), all aspects of the disposition of collateral by a secured party whose security interest was taken pursuant to a retail installment that are not expressly modified by R.C. 1317.16
are governed by R.C. 1309.47. Thus, the failure of a secured party whose security interest was taken pursuant to a retail installment contract to comply with the notice requirements of R.C. 1317.16(B) is governed by R.C. 1309.47.